Tift *vs.* The County of Dougherty.

## TIFT *vs.* THE COUNTY OF DOUGHERTY.

[Hall, J., not presiding.]

It has not been made to appear to this court wherein the proceedings were irregular or contrary to law, by which the commissioners of Dougherty county were proceeding to condemn certain property for a public road to Flint river for the purpose of erecting a free bridge across the same.

(*a.*) The commissioners had the right to employ counsel to aid them, and they were justified in so doing; nor were they thereby disqualified from determining whether the road and bridge sought to be established would be of public utility. Besides the fact of being a citizen and tax-payer, the complainant is only interested to have just compensation for the property taken from him, and the damage done to him by such taking of property and by the erection of the bridge. This compensation is to be determined by a jury, and not by the commissioners. Code, §§637, 644.

(*b.*) There has been as yet no damage done or threatened to be done to complainant of which he can complain. There is no equity in the bill, and an injunction was properly refused.
Judgment affirmed.

September 16, 1884.

BLANDFORD Justice.

[Nelson Tift filed his bill against Dougherty county, alleging, in brief, as follows: In 1837, a public ferry was opened across Flint river on the east side of the town of Albany, and was kept open until 1843, when complainant and E. B. White, trustee, purchased it of Samuel Clayton, the owner, for $4,746.60, together with all the ferry and bridge privileges that said Clayton had, as owner of the land along the banks of the river for three miles above and below the town. These privileges, it is charged, were exclusive, and could not be divested, except by proper legislation or legal condemnation. As the town has grown into a city and the population has increased, these franchises have greatly increased in value, and are now worth eighty thousand dollars. At the time of the purchase, there was a ferry at the foot of Broad street, and it had been kept in operation by Clayton for more than six years, and was thereafter operated by complainant and White, trustee, until complainant bought the interest of the latter for $3,300.00, and afterwards complainant kept the ferry in operation until December 13, 1858, at which time, after the refusal of the county authorities to aid in building a bridge, he erected a covered bridge, at his own expense, about seventy-five yards north from the ferry, and the latter was there-

upon discontinued. The bridge was erected at a cost of fifteen thousand dollars, and has been kept open for the public as a toll bridge continuously since its erection, except for the short time when it was reconstructed at a cost of fifteen thousand dollars. In 1838, the legislature granted a charter to Fort *et al.* to erect a bridge across Flint river at or near Albany, on their own land, at any point three miles above or below the town. This charter was purchased by complainant. In 1852, the state granted a charter to complainant and one Brisban, and their associates and successors, to construct a bridge across the Flint river at or opposite the city of Albany, on their own land, or on such as they purchased the right to build upon. This charter also was purchased by complainant, and these charters became inoperative against him. As owner of the land on both sides of the river, he became proprietor of all bridge and ferry rights, privileges and franchises, and under the act of 1850 (Cobb's Digest, page 958, Code, §684), erected said bridge, and the subsequent adoption of §2223 of the Code did not affect his rights. In 1861, the justices of the inferior court granted an order to keep open the ferry at the place where it had formerly existed. Complainant filed his bill against them, and they were enjoined from executing this or any similar order. For several years, negotiations for the purchase of his bridge by the county have been pending; the price of thirty thousand dollars was finally agreed upon; a special act of the legislature was procured; the question was submitted to the voters of the county, and the proper majority obtained; but the act was declared unconstitutional. In the meantime, complainant had spent three thousand dollars for repairs in accordance with the contract. The commissioners should have re-submitted the question, according to the general law governing such cases, but they have refused to do so; they have employed counsel, and are planning to deprive complainant of his property and rights without just compensation. To accomplish this, a number

of " free bridge men " were procured to apply to the com-
missioners to open a public road from a point at or near
the east end of the trestle of complainant's bridge to the
river bank.    This road would not lead to any definite
point, but would run down a bluff fifteen feet high and
terminate at the lowland on the margin of the river.  On
this application, the commissioners appointed three re-
viewers from the petitioners, though all of them lived
several miles away, while there were numerous citizens
living in sight of the proposed new road, and the law re-
quired the nearest to be appointed.  The reviewers ap-
pointed reported under oath that the proposed road would
be of great utility and convenience to the public, and the
commissioners have set the hearing for May 4, 1884.    It
is charged that the purpose of the commissioners is not
really to open a public road, but to condemn " by piece-
meal " the property, bridge rights and privileges and fran-
chises of complainant, all of which are so intimately con-
nected that neither can be settled justly and fairly with-
out the other.    Complainant's income from tolls at his
bridge is about eight thousand dollars per annum, and if
the county erects a free bridge alongside of his, he will be
injured to that extent.    The prayer was for injunction.

The deeds referred to in the bill, the judgment granting
an injunction against the justices of the inferior court, the
proceedings to open a new road and establish a free bridge,
the contract between the commissioners to proceed under
special act to submit the purchase of the bridge to a vote,
and to purchase it in case of ratification under the act
referred to in the bill, and the contract between the com-
missioners and two attorneys, are all attached as exhibits.
Under the last named contract, it was agreed that the attor-
neys should receive each $125.00 cash and $225.00 each, to
be paid upon the completion of the free bridge across the
river and the termination of the litigation growing out of
the same; and in consideration of this, they were to render
professional services to the commissioners "in and about

the building of a free bridge for said county across Flint river at Albany, Georgia, and to represent said county commissioners in any and all litigation growing out of the building of said bridge."

The commissioners answered the bill, denying that complainant had obtained any exclusive bridge rights under his purchase from Clayton, but alleged that complainant claimed under the charter granted to him and his co-corporator in 1852, when it suited his convenience, but that he constantly violated the express provisions of the charter as to the rates of toll which he was allowed to take. It was denied that complainant took any exclusive right under §684 of the Code, and it was insisted that this section was to be construed together with §2223, and did not apply to a public toll bridge. It was alleged that all of the record in the litigation between complainant and the justices of the inferior court was lost, except the decree, and it was charged that this was fraudulently obtained and was void. It was admitted that negotiations for the purchase of complainant's bridge had taken place, but it was alleged that this proceeding could not be carried out, because it had been declared illegal by the courts. It was admitted that the ultimate object of the proceeding sought to be enjoined was to establish a free bridge, as soon as the necessary legislation could be obtained to enable the commissioners to raise money for that purpose, and it was insisted that this was demanded by public utility and was for the public good. Any improper desire to injure complainant or to interfere with his vested rights was disavowed. It was alleged that the steps taken to open a public road were according to law ; that it was not sought to withhold just compensation from complainant for any injury he might sustain thereby; that he had been notified according to law, so as to give him an opportunity to prefer his claim, and that it would be paid when ascertained. By way of cross-bill, it was prayed that, if any injunction should be granted against the commissioners,

an injunction should be granted against complainant also, to restrain him from charging or collecting tolls from the public other than those allowed to be received by the charter obtained by him in 1852.

In answer to this cross-bill, complainant denied that his bridge was built under the charter of 1852, or the other charters purchased by him, and alleged that no organiza-tion was effected under those charters, although he endeavored to effect one; that his bridge was built under the act of 1850; that he only claimed, under the charters held by him, the right to prevent others from building a bridge under them. He also alleged that the county could not condemn his property without incurring a large debt, and that this could not be done without a submission to the voters thereof.

On the hearing, the chancellor refused the injunction, and complainant excepted.]